Allen WILSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9786.

Court of Appeals of Alaska.

May 22, 2009.

**24.** 872 P.2d at 1218.

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, MANNHEIMER, Judge, and STEWART, Senior Court of Appeals Judge.*

## OPINION

COATS, Chief Judge.

*Introduction*

Anchorage Police Officer Derek Sitz made a routine traffic stop of a car driven by Allen Wilson near the intersection of 36th Avenue and C Street in Anchorage. During the traffic stop, Sitz discovered that Wilson was in possession of a loaded .45 revolver and that Wilson had previously been convicted of a felony. Sitz arrested Wilson for being a convicted felon in possession of a concealable firearm.[1]

After the State indicted Wilson, he moved to dismiss the indictment on the ground that the statute that prohibited him from possessing a concealable firearm violated article I, section 19 of the Alaska Constitution, which protects "[t]he individual right to keep and bear arms." Superior Court Judge Michael L. Wolverton denied Wilson's motion to dismiss the indictment. Following his conviction, Wilson appealed Judge Wolverton's denial of his motion to dismiss. We affirm.

*Why we conclude that AS 11.61.200(a)(1) does not violate article I, section 19 of the Alaska Constitution*

The thrust of Wilson's argument is that the statute prohibiting a felon from possessing a concealable firearm violates article I, section 19 of the Alaska Constitution because it does not differentiate between violent and non-violent felons, and thus is not narrowly tailored to achieve the State's compelling interest in preventing violent crime. Wilson argues that article I, section 19 guarantees an individual's right to keep and bear arms, and therefore any law that restricts that right must be narrowly tailored to protect a compelling government interest.

Wilson points out that he was convicted of a non-violent, class C felony—theft in the second degree—for fraudulently obtaining unemployment benefits. He states that he is a sixty-seven-year-old man who lives in a cabin on a homestead, lives a subsistence lifestyle, and needs a handgun for personal protection. He argues that the State cannot justify restricting his constitutional right to possess a concealable firearm.

Courts—including this court—have consistently rejected arguments similar to Wilson's. For example, the United States Supreme Court recently decided *District of Columbia v. Heller*[2] under the Second Amendment to the United States Constitution, which provides, "[a] well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."[3] At issue was a District of Columbia law that prohibited a person from carrying an unlicensed handgun.[4] The law authorized the chief of police to issue one-year licenses and required residents to keep any "lawfully owned firearms ... 'unloaded and dissembled or bound by a trigger lock or similar device.'"[5] Heller, a D.C. special police officer, applied to register a handgun he wished to keep at his home. When the District refused his application, Heller filed for an injunction.[6]

The Court held that the Second Amendment protects an individual's right to possess

---

* Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution and Administrative Rule 23(a).

1. AS 11.61.200(a)(1).

2. 554 U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

3. *Id.* at ——, 128 S.Ct. at 2788.

4. *Id.*

5. *Id.*

6. *Id.*

a firearm.[7] "Under any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," the Court held, the District's total ban on the possession of handguns in the home and the requirement that any lawfully possessed firearms in the home be dissembled or bound by a trigger lock was unconstitutional because it made it impossible for a citizen to use the firearm for "the core lawful purpose of self-defense."[8]

The Court made it clear, however, that the right to keep and bear arms, like other rights, is not unlimited.[9] The Court specifically stated that "nothing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms *by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[10] Furthermore, the majority opinion seems to indicate that if Heller were a convicted felon, the District could refuse to allow him to register his handgun and possess it in his home. The majority states, "[a]ssuming that Heller *is not disqualified from the exercise of Second Amendment rights,* the District must permit him to register his handgun and must issue him a license to carry it in the home."[11] Therefore, *Heller* provides little support for Wilson's argument.

It is important to note that *Heller* was decided under the Second Amendment to the United States Constitution. It is unclear whether the Second Amendment applies to the states. In 1894, the United States Supreme Court held that the Second Amendment applies only to the federal government and not to the states.[12] But just recently, a panel of the Ninth Circuit Court of Appeals concluded that the *Heller* decision now mandates the opposite result.[13] In *Nordyke v. King,*[14] the Ninth Circuit held (based on *Heller* ) that the Second Amendment protects a fundamental liberty interest and therefore "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment and applies it against the states."[15]

We need not address this issue further because, as we have already noted, the Supreme Court declared in *Heller* that "nothing in [its] opinion should be taken to cast doubt" on the laws prohibiting felons from possessing firearms.

However, the Alaska Constitution also expressly protects an individual's right to keep and bear arms. Article I, section 19 of the Alaska Constitution provides:

> A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed. The individual right to keep and bear arms shall not be denied or infringed by the State or a political subdivision of the State.

We discussed this provision of the Alaska Constitution in *Gibson v. State.*[16] In that case, the defendants argued that the statute prohibiting possession of firearms while intoxicated was unconstitutional under article I, section 19 of the Alaska Constitution when applied to a person who is on his own property or in his own home.[17] In that decision, we analyzed the 1994 amendment to article I, section 19 of the Alaska Constitution, which added the language: "The individual right to keep and bear arms shall not be denied or

---

7. *Id.* at —, 128 S.Ct. at 2799, 2814.

8. *Id.* at —, 128 S.Ct. at 2817–18.

9. *Id.* at —, 128 S.Ct. at 2799, 2816.

10. *Id.* at —, 128 S.Ct. at 2816–17 (emphasis added).

11. *Id.* at —, 128 S.Ct. at 2822 (emphasis added).

12. *See United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588 (1875); *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886); *Miller v. Texas,* 153 U.S. 535, 538, 14 S.Ct. 874, 875, 38 L.Ed. 812 (1894); *Heller,* 554 U.S. at —, 128 S.Ct. at 2813 n. 23.

13. *Nordyke v. King,* 563 F.3d 439, 456–57 (9th Cir.2009).

14. 563 F.3d 439.

15. *Id.* at 457.

16. 930 P.2d 1300 (Alaska App.1997).

17. *Id.* at 1301.

infringed by the State or a political subdivision of the State." [18]

In analyzing the intent of the voters who approved this constitutional amendment, we looked to the statement in support of the ballot measure that appeared in the Division of Elections's 1994 official election pamphlet.[19] We relied on the statement, which was prepared by the advocates of the proposed amendment, that assured voters that the amendment "[would] NOT overturn or invalidate state laws restricting access or possession of arms by convicted felons, mental incompetents, illegal aliens, those under the influence of drugs or alcohol, juveniles, or in school buildings." [20] The pamphlet further stated, "These laws are well established and have been consistently upheld in Courts across the nation, even when considered under the toughest legal standard and under constitutional language more stringent than is proposed by [this amendment]." [21] Relying on this language and the history of the proposed amendment, we concluded "that the people who voted in favor of the amendment did not intend to invalidate Alaska's laws regulating the possession of firearms by intoxicated persons." [22]

We then considered whether the statute violated Alaska's constitutional right to privacy under article I, section 22 of the Alaska Constitution, and we ultimately concluded that the Alaska statute prohibiting the possession of a firearm while intoxicated bore "a close and substantial relationship to the state's legitimate interest in protecting the health and safety of its citizens," and was therefore constitutional.[23]

Two years later, in *DeMars v. State*,[24] an unpublished decision, this court held that article I, section 19 of the Alaska Constitution did not invalidate DeMars's conviction for being a felon in possession of a concealable firearm.[25] DeMars had been convicted of a felony in 1987 for leaving the scene of an accident and had been unconditionally released.[26] Relying on *Gibson*, we stated that article I, section 19 "did not limit the State's authority to regulate firearms when there is a significant risk that firearms will be used in a criminal or dangerous fashion." [27] We then concluded: "Because the legislature has the authority to regulate the possession of firearms by convicted felons, and because article I, section 19 does not restrict that authority, DeMars cannot rely on that provision to claim the statute violates article I, section 19." [28] DeMars also argued that the felon in possession statute violated equal protection because the statute did not distinguish between violent and non-violent felons.[29] We rejected that challenge as well.[30]

Therefore, under our prior cases, we have rejected the constitutional challenge that Wilson now brings. Furthermore, other states have consistently rejected similar constitutional challenges.[31] We accordingly conclude that Judge Wolverton did not err in denying Wilson's motion to dismiss.

The judgment of the superior court is AFFIRMED.

STEWART, Senior Judge, concurring.

MANNHEIMER, Judge, dissenting.

**18.** *Id.*

**19.** *Id.* at 1302.

**20.** *Id.*

**21.** *Id.*

**22.** *Id.*

**23.** *Id.*

**24.** Alaska App. Memorandum Opinion and Judgment No. 4100 (Aug. 18, 1999),1999 WL 652444.

**25.** *Id.* at 5, 1999 WL 652444 at *2.

**26.** *Id.* at 1–2, 1999 WL 652444 at *1.

**27.** *Id.* at 5, 1999 WL 652444 at *2.

**28.** *Id.*

**29.** *Id.*

**30.** *Id.* at 6, 1999 WL 652444 at *3.

**31.** *See, e.g., State v. Brown*, 571 A.2d 816 (Me. 1990); *State v. Cole*, 264 Wis.2d 520, 665 N.W.2d

STEWART, Senior Court of Appeals Judge, concurring.

I concur with Chief Judge Coats's lead opinion. I provide additional comment in light of Judge Mannheimer's dissent.

An appellate court must apply its own independent judgment when deciding questions of constitutional law [1] and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [2] The Alaska Supreme Court provided the following guidance for interpreting a constitutional provision: "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense. The court should look to the plain meaning and purpose of the provision and the intent of the framers." [3]

But in this case, because we are interpreting a constitutional provision that necessarily was approved by the voters, our foremost concern should be discerning the likely meaning placed on the provision by those voters. [4] In *Gibson v. State*, [5] this court concluded that the official statement in support of the ballot measure enacting the amendment to Article I, Section 19 of the Alaska Constitution was more important to discerning the intent of the voters than the legislative history of the Legislative Resolve that was presented to the voters; and this was despite the substantial amount of legislative history that would have supported a conclusion that the voters did not intend to limit the longstanding public safety regulation of firearms possession by intoxicated persons. [6]

Judge Mannheimer concludes that this court's decision in *Gibson* is in doubt because members of the legislature and some witnesses promoted a strict scrutiny standard of review. But there is no indication that the voters who approved the amendment to the constitution were privy to the proceedings before the legislature, or if they were, that they would understand the significance of adopting that standard of review. And even if the voters were apprised of the legislative proceedings, there is support in that record for the voters to reach the same conclusion this court reached in *Gibson*.

Most importantly, in the voter's pamphlet explaining the question on the ballot, the advocates of the ballot measure flatly stated that the amendment would "NOT overturn or invalidate state laws restricting access or possession of arms by convicted felons...." [7] Therefore, I conclude that a reasonable and practical interpretation of the amendment to Article I, Section 19 in light of common sense is that the voters never intended to undermine state laws restricting the possession of firearms by convicted felons.

Furthermore, it has been more than a decade since *Gibson* was decided, and almost a decade since this court decided *Demars v. State*, [8] a case in which this court relied on *Gibson* to reject the claim that Article I, Section 19 invalidated the felon-in-possession statute presently before us. [9] If the analysis in these two cases was flawed, the legislature could have undertaken action to correct that flaw. That is, if the legislature concludes that the felon-in-possession statute is unconstitutional, the legislature may act to repeal that statute.

Finally, even if this issue was debatable at the time we decided *Gibson*, I conclude that stare decisis now compels us to uphold that decision. Stare decisis is a practical and flexible doctrine that balances the State's

328 (2003); *People v. Swint*, 225 Mich.App. 353, 572 N.W.2d 666 (1997).

1. *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992).

2. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

3. *Arco Alaska*, 824 P.2d at 710 (internal citations omitted).

4. *See, e.g., Hickel v. Halford*, 872 P.2d 171, 176–77 (Alaska 1994); *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 169 (Alaska 1991); *State v. Lewis*, 559 P.2d 630, 637–38 (Alaska 1977).

5. 930 P.2d 1300 (Alaska App.1997).

6. *Id.* at 1301–02.

7. *Id.* at 1302.

8. Alaska App. Memorandum Opinion and Judgment No. 4100 (Aug. 18, 1999), 1999 WL 652444.

9. *Id.* at 4–5, 1999 WL 652444 at *2.

competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands.[10] When balancing these interests, a court should overrule a prior decision only when "clearly convinced [that] the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent...."[11] As discussed above, I am not convinced that *Gibson* was erroneously decided. Moreover, I am not convinced that *Gibson* is unsound because of any changed conditions. Nor do I see that more good than harm would result from our repudiation of *Gibson*. Accordingly, I join Chief Judge Coats in affirming Wilson's conviction.

## MANNHEIMER, Judge, dissenting.

In 1994, the voters of Alaska amended Article I, Section 19 of our state constitution to explicitly guarantee an individual's right to keep and bear arms. This amendment declares: "The individual right to keep and bear arms shall not be denied or infringed by the State or a political subdivision of the State."

Despite this constitutional bar on the denial or infringement of an individual's right to keep and bear arms, there are several Alaska statutes that restrict the possession or use of firearms. One of these statutes, AS 11.61.200(a)(1), prohibits all convicted felons from possessing concealable firearms.

The question presented in this appeal is whether this statute contravenes the right to keep and bear arms guaranteed by Article I, Section 19 to the extent that the statute bans the possession of concealable firearms by people who have been convicted of non-dangerous felonies.

(The defendant in this case, Allen Wilson, was convicted of second-degree theft for fraudulently obtaining unemployment benefits.)

This is not the first time that this Court has considered the 1994 amendment to Article I, Section 19. In *Gibson v. State*, 930 P.2d 1300 (Alaska App.1997), this Court concluded that, despite the broad language of the 1994 amendment—that is, despite its apparently sweeping prohibition on legislative regulation of firearms—the 1994 amendment was not intended to bar the legislature from enacting reasonable restrictions on the possession or use of firearms.[1] This Court also concluded that the 1994 amendment implicitly confirmed the continued constitutionality of most, if not all, of Alaska's then-existing firearms laws.[2]

If the conclusion we reached in *Gibson* is correct—that is, if the 1994 amendment to Article I, Section 19 was intended to allow the legislature to continue to enact reasonable regulations pertaining to the possession and use of firearms, and if the 1994 amendment was intended to affirm the constitutionality of Alaska's then-existing firearms laws—then it is obvious that Wilson should lose this appeal. Courts from around the country have overwhelmingly concluded that it is reasonable to restrict felons' possession of firearms, even if the underlying felony conviction was for a non-violent crime. And the felon-in-possession statute that Wilson challenges was enacted years before the 1994 amendment was approved.

But in Wilson's brief to this Court, he repeatedly asserts that our discussion of the 1994 amendment in *Gibson* does not accurately describe the legislative record. Prompted by these assertions in Wilson's brief (and by the State's curiously ambiguous response to Wilson's assertions), I decided that I needed to personally examine the historical materials that *Gibson* relied on: the legislative debates concerning the 1994 amendment, and the 1994 election pamphlet which presented the proposed amendment to the voters of Alaska.

Based on my review of these materials, I have concluded that the decision we reached

---

**10.** *See State v. Fremgen*, 914 P.2d 1244, 1245 (Alaska 1996).

**11.** *State v. Dunlop*, 721 P.2d 604, 610 (Alaska 1986) (quoting *State v. Souter*, 606 P.2d 399, 400 (Alaska 1980)).

**1.** *Gibson*, 930 P.2d at 1301, 1302.

**2.** *Id.* at 1302.

in *Gibson* is wrong—because that decision rests on two mistaken premises.

The first flaw in *Gibson* is that it completely mischaracterizes the legislative debates concerning the 1994 amendment.

*Gibson* asserts that, even though the 1994 amendment declares that "[t]he individual right to keep and bear arms shall not be denied or infringed by the State", the drafters of this amendment did not intend to bar the legislature from enacting reasonable laws regulating the possession and use of firearms. This assertion is simply false.

The legislative history of the 1994 amendment unequivocally reveals that the drafters and supporters of this amendment intended to prohibit the legislature from enacting firearms laws that were merely "reasonable". The proponents of the amendment repeatedly declared that they wanted to set the constitutional bar higher: they wanted to prohibit the legislature from enacting any firearms law that was not supported by, and narrowly tailored to, a compelling state interest.

Not only did the drafters and supporters of the 1994 amendment consistently affirm their desire to impose a "strict scrutiny"/"compelling state interest" test for firearms laws, but these legislators repeatedly rejected efforts to change the wording of the amendment in ways that would have guaranteed the legislature's authority to enact "reasonable" firearms laws, or that would have guaranteed the constitutionality of Alaska's then-existing firearms laws.

The legislators and executive branch officials who proposed these changes—that is, the opponents of the 1994 amendment— agreed with the amendment's supporters that the amendment, as written, would require strict scrutiny of firearms laws. It was this shared understanding of the legal substance of the 1994 amendment that engendered the lengthy legislative debates concerning the wisdom of the proposed amendment—and, more particularly, the amendment's likely effect on Alaska's existing firearms laws.

The opponents of the amendment feared that, under strict scrutiny, many of Alaska's existing firearms laws would be declared unconstitutional in whole or in part. For this reason, they repeatedly proposed supplemental language that would have re-affirmed the legislature's authority to enact "reasonable" firearms regulations, or that would have re-affirmed the pre-existing "sliding scale" test for the constitutionality of firearms laws. The opponents of the amendment also proposed supplemental language that would have expressly affirmed the constitutionality of Alaska's existing firearms laws. All of these attempts were repeatedly (and soundly) defeated by the pro-amendment majority.

In other words, the legislative debates and votes surrounding the 1994 amendment clearly demonstrate that the sponsors and supporters of this amendment wished to change a fundamental aspect of Alaska's firearms law—altering the level of constitutional scrutiny that would apply to statutes and ordinances regulating the possession or use of firearms. The proponents of the 1994 amendment repeatedly declared that they wanted the Alaska courts to stop using the "sliding scale" test for evaluating the constitutionality of firearms laws (the test this Court used in *Gibson*), and to start using a "strict scrutiny" or "compelling state interest" test.

Thus, this Court was wrong when we declared in *Gibson* that "the [legislative] history of the [1994] amendment contains no indications" that anyone thought that the amendment would cast constitutional doubt on Alaska's existing firearms laws, or that the amendment would bar the legislature from enacting reasonable firearms laws. *Gibson*, 930 P.2d at 1302.

The second flaw in *Gibson* is that this Court relied on statements in the 1994 election pamphlet as a legal basis for interpreting the proposed amendment in a manner that departed from the intentions of the amendment's legislative drafters and supporters.

Under Article XIII, Section 1 of the Alaska Constitution, the voters have no power to propose constitutional amendments. Rather, constitutional amendments must be proposed by the legislature. If a proposed amendment

is approved by a two-thirds' majority of both houses of the legislature, it is then submitted to the voters for ratification.

In the case of the 1994 amendment to Article I, Section 19, both the legislative supporters and the legislative opponents of the amendment agreed that, if the measure was enacted, all firearms laws (both existing and future) would have to survive a "compelling state interest" or "strict scrutiny" analysis. But in *Gibson*, this Court relied on the contents of a statement in the 1994 election pamphlet—the statement submitted by supporters of the amendment—as the basis for interpreting the amendment to allow the legislature to engage in "reasonable" regulation of firearms.

In their election pamphlet statement, the supporters of the 1994 amendment tried to assure voters that the amendment would have no effect on most of Alaska's firearms laws. But this was simply a prediction that Alaska's existing firearms laws would survive the strict scrutiny analysis required by the 1994 amendment. It was not a repudiation of the legislature's intent to require strict scrutiny.

Moreover, even if the authors of the election pamphlet statement *had* thought (erroneously) that the 1994 amendment did not impose a strict scrutiny/compelling state interest test, and that the legislature would continue to have the authority to enact "reasonable" firearms laws, this mistaken view of the amendment could not, as a legal matter, alter the meaning of the amendment as proposed by the legislature. Under Alaska law, it is the legislature that proposes amendments to our constitution, and the voters simply have the power to approve or reject these proposed amendments.

In other words, it was wrong (as a legal matter) for this Court in *Gibson* to rely on the predictions contained in the election pamphlet statement as a justification for interpreting the 1994 amendment to allow the legislature to enact "reasonable" firearms laws. Rather, it was—and is—our duty to apply the "compelling state interest" test to firearms laws, as the drafters of the 1994 amendment intended.

For these reasons, I conclude that *Gibson* was wrongly decided. Contrary to what we said in *Gibson*, when a law restricting the possession of firearms is challenged under Article I, Section 19 of the Alaska Constitution, a court is not allowed to uphold the law simply because it bears a "close and substantial relationship" to a legitimate government interest, or because the law is a reasonable exercise of the legislature's regulatory authority. The 1994 amendment to Article I, Section 19 was intended to ensure that all firearms laws (both then-existing laws and future laws) would be subjected to strict scrutiny, and that these laws would be upheld only if they were narrowly tailored to a compelling state interest.

Accordingly, we should overturn *Gibson*, and we should direct the parties to brief the question of whether the current ban on the possession of concealable firearms by non-dangerous felons meets the "compelling state interest" test.

*The history of the 1994 constitutional amendment in the Alaska Senate*

In its original form (*i.e.*, as originally enacted by the voters of Alaska), Article I, Section 19 of the Alaska Constitution was worded similarly to the Second Amendment of the Federal Constitution:

> A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed.

But in January 1993, a few days after the Eighteenth Legislature convened, several state senators (Senators Donley, Kelly, Frank, Phillips, and Kerttula) sponsored a bill—Senate Joint Resolution No. 1—calling for an amendment to Article I, Section 19 to clarify that this provision of the constitution protected an individual's right to keep and bear arms.

Section 1 of Senate Joint Resolution No. 1 proposed that Article I, Section 19 be amended by adding the following sentence:

> The individual right to keep and bear arms shall not be denied or infringed by the State or a political subdivision of the State.

Apparently recognizing that this far-reaching language might be employed to attack Alaska's existing firearms laws, the sponsors of Joint Resolution No. 1 included a second section in their bill that called for a complementary amendment to Article XV of the constitution. This proposed amendment to Article XV declared that the new language in Article I, Section 19 was not intended to call Alaska's existing firearms laws into question, nor was it intended to alter the level of constitutional scrutiny that the courts of Alaska would employ when adjudicating constitutional challenges to firearms laws:

> * Section 2. Article XV, Constitution of the State of Alaska, is amended by adding a new section to read:
>
> Section 29. **Effect of 1994 Amendment of Section 19 of Article I.** The 1994 amendment of Section 19 of Article I does not affect or change any law relating to arms that is in effect on the date of ratification of the 1994 amendment of that section, nor does it affect or change the judicial standard of review applicable to laws relating to the misuse of arms.

This Joint Resolution did not pass the legislature. Instead, one year later (almost to the day), the Senate State Affairs Committee chaired by Senator Loren Leman proposed a competing bill, Senate Joint Resolution No. 39.

Senate Joint Resolution No. 39 called for adding the same new sentence to Article I, Section 19: "The individual right to keep and bear arms shall not be denied or infringed by the State or a political subdivision of the State." However, Joint Resolution No. 39 conspicuously omitted any provision to preserve Alaska's existing firearms laws or to preserve the existing level of constitutional scrutiny in judicial challenges to firearms laws.

During the 1994 legislative session, these two competing bills—Senate Joint Resolution No. 39 and Senate Joint Resolution No. 1— were the subject of considerable debate in the state senate. There was essentially no debate as to whether Article I, Section 19 should be amended to clarify that it protected the individual right to keep and bear arms. Rather, the point of contention was whether the senate should adopt Joint Resolution No. 39 (which had no "saving" provision to protect Alaska's existing firearms laws) or Joint Resolution No. 1 (which contained supplemental provisions to expressly protect existing firearms laws and to expressly preserve the then-current level of constitutional scrutiny applicable to firearms laws).

When the Senate State Affairs Committee held its first public hearing on Joint Resolution No. 39 on January 21, 1994, the first witness to address the Committee was Anchorage Deputy Chief of Police Duane Udland.[3] Deputy Chief Udland declared that he and other law enforcement officers did not oppose an individual right to keep and bear arms, but he told the Committee that the law enforcement community "[had] a deep concern over the effects the [proposed] amendment [would] have".[4]

Udland warned that "[if] the constitution [was to be] changed", the amendment "must be carefully worded"—or else the amendment "would limit the ability of municipalities and the [state] legislature to pass reasonable laws regulating firearms that are necessary to protect the public".[5] Udland urged the State Affairs Committee to abandon their own proposal (Joint Resolution No. 39) in favor of Joint Resolution No. 1, because Joint Resolution No. 1 "better answer[ed] the concerns of law enforcement".[6]

In response to Deputy Chief Udland's comments, Senator Robin Taylor opined that, given the "flood of weapons misuse" in our society, "perhaps everyone should be armed in order to protect themselves".[7] Udland conceded that violent crime was on the rise, but he questioned whether the answer was a

---

**3.** Minutes of the Senate State Affairs Committee for January 21, 1994, Tape 94–2, Side B at 463.

**4.** *Id.* at 425.

**5.** *Id.*

**6.** *Id.*

**7.** *Id.* at 376.

constitutional amendment.[8] Udland told the Committee he was worried that the language of Joint Resolution No. 39 might be "[so] strict [that] the courts will strike down any law regulating possession of firearms."[9]

The chair of the Committee, Senator Leman, then called on the Committee's legislative aide, Portia Babcock, to describe Joint Resolution No. 39 and to respond to Udland's last comment. Ms. Babcock told the Committee that the constitutional amendment proposed in Joint Resolution No. 39 was intended "to protect and [e]nsure the right to keep and bear arms in the future", but it was "not intended to change anything today, or to abrogate any laws currently on the books."[10] Ms. Babcock also told the Committee that, based on prior appellate decisions, the Alaska Supreme Court was unlikely to interpret the new amendment broadly.[11] She assured the Committee that "[c]ase law has consistently recognized that the right to keep and bear arms is not an absolute right."[12]

Ms. Babcock's comments on the intended effect of the constitutional amendment closely track the characterization of the legislative debate that appears in this Court's *Gibson* decision. But, in truth, Ms. Babcock's comments do not summarize or accurately characterize the legislature's intentions.

Just after Ms. Babcock made her comment that "the right to keep and bear arms is not an absolute right", Senator David Donley interjected, "for the record", that "the proper judicial standard of review, in terms of balancing firearms rights of individuals versus the protection of society, is a compelling public safety interest standard."[13]

Following Senator Donley's comment, a number of witnesses testified in favor of Joint Resolution No. 39. One witness asserted that "the federal government is doing everything it can to take away our freedom, our rights, and our guns", so it was "important that the State of Alaska stand up and commit itself."[14] Another witness declared that the right to keep and bear arms was, in fact, "a partisan issue"—and he urged the legislature "not to water down this legislation".[15] A third witness stated that, in his view, it is never proper for the government to enact restrictions on firearms, even when a valid public safety concern exists. This witness declared that he "interprets the Constitution literally, and [he] believes it is unconstitutional to restrict firearms in any manner."[16]

Toward the end of the public comments, a member of the Anchorage Municipal Assembly, Joe Murdy, expressed concern that, if the amendment passed, "local governments might no longer have control over weapons within city limits".[17] In response, Senator Leman assured Assemblyman Murdy that Joint Resolution No. 39 "[would] not restrict municipalities from dealing with appropriate local restrictions on firearms."[18]

But just as Ms. Babcock's earlier sanguine interpretation of Joint Resolution No. 39 had drawn a rebuttal from Senator Donley, Senator Leman's attempt to re-assure Assemblyman Murdy drew a response from Senator Taylor.

Immediately after Senator Leman made the comment that the proposed constitutional amendment would not stop municipalities from enacting "appropriate" restrictions on firearms, Senator Taylor "mention[ed] [what] Senator Donley noted earlier: . . . [that] the proper judicial standard of review [when] balancing [the] firearms rights of individuals versus the protection of society is a compelling public safety interest standard."[19] Sen-

8. *Id.* at 332.

9. *Id.*

10. *Id.* at 273.

11. *Id.*

12. *Id.*

13. *Id.* at 218.

14. *Id.* at 183.

15. *Id.,* Tape 94–3 Side A at 001.

16. *Id.* at 164.

17. *Id.* at 069.

18. *Id.* at 091.

19. *Id.* at 095.

ator Taylor declared that he wanted "to state for the record, and [to] stress", that this compelling public interest standard was "the intent of SJR 39".[20] Senator Taylor expressed his belief that any "appropriate" restrictions on the right to keep and bear arms would meet this standard of scrutiny.[21]

Neither Senator Leman nor any other member of the State Affairs Committee expressed disagreement with the remarks of Senators Donley and Taylor on this subject. In other words, the apparent understanding and intent of the Senate State Affairs Committee was that the constitutional amendment proposed in Joint Resolution No. 39 would require the courts to apply a "compelling state interest" or "strict scrutiny" standard when adjudicating the constitutionality of laws regulating the possession or use of firearms.

After Joint Resolution No. 39 was released by the Senate State Affairs Committee, it next went to the Senate Judiciary Committee. The Judiciary Committee considered Joint Resolution No. 39 at a hearing on February 4, 1994.[22]

At this February 4th hearing, the battle lines were drawn by the proponents of the two competing joint resolutions. Senator Leman appeared and spoke on behalf of Joint Resolution No. 39 (the joint resolution sponsored by his State Affairs Committee). The opposing advocate was Assistant Attorney General Dean Guaneli, who told the Judiciary Committee that the constitutional amendment proposed in Joint Resolution No. 39 placed many state firearms laws at risk—and that the Department of Law, the Department of Public Safety, and the Alaska Association of Chiefs of Police were united in their opposition to Joint Resolution No. 39.[23]

Mr. Guaneli spoke at length about the dangers posed by Joint Resolution No. 39. In particular, he told the Committee that the courts would apply a "strict scrutiny" analysis when deciding whether a firearms law comported with the amended version of Article I, Section 19. Under this analysis, the government would be required to demonstrate "a compelling, overriding state interest" before the courts would uphold any firearms regulations.[24]

With particular regard to the issue raised in the present appeal (i.e., the constitutionality of the statute prohibiting felons from possessing concealable firearms), Mr. Guaneli warned the Committee that he doubted that the State could satisfy the strict scrutiny test with regard to prohibiting non-violent felons from possessing concealable firearms, or from living in households where another household member owns a concealable firearm.[25] Mr. Guaneli further warned the Committee of the possibility that many other Alaska firearms laws "would be in jeopardy if [Joint Resolution No. 39] passe[d]." [26]

Mr. Guaneli then discussed the compromise embodied in Joint Resolution No. 1, which (Mr. Guaneli explained) was drafted by himself and Senator Donley.[27] As noted above, Joint Resolution No. 1 proposed the same amendment to Article I, Section 19, but it also included an amendment to Article XV whose purpose was to clarify that the new clause regarding the individual right to keep and bear arms was not intended to alter the standard of judicial review in constitutional challenges to firearms laws.[28] Mr. Guaneli urged the Judiciary Committee to adopt Joint Resolution No. 1 and to reject any constitutional amendment that would require strict scrutiny.[29]

In rebuttal to Mr. Guaneli's comments, Senator Leman took the floor and empha-

20. *Id.*

21. *Id.*

22. Minutes of the Senate Judiciary Committee for February 4, 1994, Tape 94–6, Side B, starting at 523.

23. *Id.* at 523.

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.*

28. *Id.* at 352.

29. *Id.*

sized that "the legislative history"—*i.e.,* the discussion at the hearing held by his State Affairs Committee the previous month—made it clear "that appropriate restrictions [on the possession and use of firearms] would continue to be [lawful]".[30] He told the Judiciary Committee that Joint Resolution No. 39 was intended to be a "clean constitutional amendment" that would do no more "than clarify what everyone already thinks the Constitution means".[31]

Senator Donley then further undercut Mr. Guaneli's position. Despite the fact that he had apparently co-authored Joint Resolution No. 1 with Mr. Guaneli the previous year, Senator Donley reiterated his position that "the proper standard for firearms laws is a strict scrutiny review".[32] Although Senator Donley expressed his opinion that "very few" firearms "safety requirements" would fail to meet this test, the senator told the Judiciary Committee that the proper test was whether the government could demonstrate "a compelling public safety interest" to justify firearms regulations.[33]

Following Senator Donley's remarks, the Judiciary Committee began to hear comments from members of the public. The very first witness made a point of declaring that he agreed with Senator Donley's position—*i.e.,* that all firearms laws should have to satisfy the strict scrutiny test.[34] The second witness echoed this view.[35] The fourth witness "thanked Senator Leman for his ongoing efforts to protect [the] right to own guns".[36] Another witness, a police officer, told the Committee that even though the Alaska police chiefs might be opposed to Joint Resolution No. 39, this was not the position of rank-and-file officers. The officer urged the Committee to pass Joint Resolution No. 39.[37]

In all, more than a dozen citizens spoke, and all but one supported Joint Resolution No. 39. In addition, Senator Leman's aide, Portia Babcock, informed the Judiciary Committee that both the Municipality of Anchorage and the City of Fairbanks had endorsed Joint Resolution No. 39, and the Matanuska–Susitna Borough was also likely to do so.[38]

Following this outpouring of support for Joint Resolution No. 39, Senator Donley—who was the prime sponsor of the competing resolution, Joint Resolution No. 1—announced that he now supported Joint Resolution No. 39.[39] Senator Donley also stated that he wished to prepare a "letter of intent" to bring to the Judiciary Committee. Senator Donley declared that this letter of intent would "clarify[ ] the . . . difference between a 'compelling state interest' and a 'reasonable state interest'—because the higher standard is what's appropriate." [40]

Following Senator Donley's remarks, a member of the Committee called the question—*i.e.,* called for a vote on the motion to pass Joint Resolution No. 39 out of the Committee. In response, the Committee unanimously agreed that Joint Resolution No. 39 "do pass".[41]

Seven days later (on February 11, 1994), despite Senator Donley's announcement in the committee hearing that he supported Joint Resolution No. 39, the senator sponsored a revised, substitute version of Joint Resolution No. 1. This substitute version of Joint Resolution No. 1 still called for a clarifying amendment to Article XV of the constitution, but the scope of this clarifying amendment was now narrower than in the original version of Joint Resolution No. 1.

In its new version, the proposed amendment to Article XV preserved the existing

---

30. *Id.* at 240.

31. *Id.*

32. *Id.* at 121.

33. *Id.*

34. *Id.*

35. *Id.,* Tape 94–6, Side A at 010.

36. *Id.*

37. *Id.* at 139.

38. *Id.* at 200.

39. *Id.* at 250.

40. *Id.*

41. *Id.* at 290.

standard of judicial review for only two types of firearms regulations: "laws relating to access to [arms] or possession of arms by convicted felons", and laws relating to "misuse of arms". Here is the proposed amendment to Article XV In its entirety:

> * Section 2. Article XV, Constitution of the State of Alaska, is amended by adding a new section to read:

> Section 29. **Effect of 1994 Amendment of Section 19 of Article I.** The 1994 amendment of Section 19 of Article I does not affect or change any law relating to arms that was in effect on January 1, 1994, nor does it affect or change the judicial standard of review applicable to laws relating to access to or possession of arms by convicted felons or to the misuse of arms.

But, as events proved, it was too late to stop the progress of Joint Resolution No. 39 in the state senate.

The Senate Finance Committee was the final senate committee to review the two competing resolutions. At the Finance Committee's hearing of February 15, 1994, Portia Babcock spoke in favor of Joint Resolution No. 39 and again indicated that this resolution had received overwhelming support from citizens and local governments around the state.[42] However, Ms. Babcock backed away from her earlier predictions that the proposed constitutional amendment would have no effect on Alaska's existing firearms laws. Ms. Babcock's changed position on this matter is reflected in a colloquy between her and Senator Rieger.

Just after Ms. Babcock finished her introductory remarks concerning Joint Resolution No. 39, Senator Rieger asked her how the proposed constitutional amendment would affect the state's existing concealed weapons law. Babcock initially answered that the amendment should not affect that law—but then she conceded she "[had] no idea how the

[proposed] language would be interpreted" by the courts.[43]

Apparently dissatisfied with this answer, Senator Rieger pressed the issue. He asked Babcock if the Senate State Affairs Committee had discussed whether the proposed amendment "would prohibit the state from exercising any kind of statutory restrictions on carrying a concealed weapon".[44] Babcock replied that the State Affairs Committee had indeed discussed this issue, "but [that] the impact [of the proposed constitutional amendment] was unknown since the [supreme] court had not interpreted the language."[45] Babcock declared that "no one knew the answer [to this question]" and that the supreme court "would have to balance the state's police power [against] the individual's constitutional right to keep and bear arms."[46]

Babcock's answers prompted Senator Rieger to declare that he was "not comfortable" with the proposed constitutional amendment—because "it seemed that the intent [of the drafters] was that the courts not take the [language of the amendment] literally".[47]

Assistant Attorney General Guaneli then spoke in opposition to Joint Resolution No. 39.[48] He reiterated that the Department of Law, the Department of Public Safety, and the Alaska Association of Chiefs of Police all opposed the constitutional amendment in the form proposed by Joint Resolution No. 39.[49] And he again spoke of the risk to Alaska's existing firearms laws if the proposed amendment was enacted.

Guaneli told the Finance Committee that if Article I, Section 19 was amended as proposed in Joint Resolution No. 39 (*i.e.*, without any provision to save Alaska's existing firearms laws or to preserve the existing standard of constitutional review), "several of Alaska's weapons laws would be thrown into doubt and [might] be held unconstitution-

---

42. Minutes of the Senate Finance Committee for February 15, 1994, Tape SFC–94, # 25, Side 1 (000 to end).

43. *Id.*

44. *Id.*

45. *Id.*

46. *Id.*

47. *Id.*

48. *Id.*

49. *Id.*

al." [50] Among the laws that Mr. Guaneli singled out as being subject to constitutional challenge under the proposed amendment were the laws prohibiting non-violent felons from possessing handguns and prohibiting non-violent felons from residing in homes where a handgun is kept.[51]

Mr. Guaneli warned the Committee not to adopt a constitutional amendment whose interpretation was not clear. For instance, Guaneli noted that some supporters of Joint Resolution No. 39 had declared that their intention was to prevent municipalities from enacting any type of firearms laws.[52] Guaneli urged the Committee to adopt the version of the amendment proposed in Joint Resolution No. 1—because Joint Resolution No. 1 "included a second section . . . that gave the court[s] . . . guidance in how [they were] to interpret this [amendment to Article I, Section 19]"—*i.e.*, a clarification that the amendment was not intended to "change any law that was in effect, nor the judicial standard that had been applied to firearms laws." [53]

In response to Mr. Guaneli's comments, Senator Frank voiced his opinion that the constitutional amendment proposed in Joint Resolution No. 39 did not create any "heightened protection"; rather, the amendment was simply "a clarification" that Article I, Section 19 guaranteed an individual right to keep and bear arms (as opposed to a collective right).[54]

But Mr. Guaneli replied that, "when[ever] the Constitution [is] changed, the courts [presume] that [the change] had to mean something." [55] Guaneli warned that, unless the proposed amendment to Article I, Section 19 was clarified, it would likely alter the way that this section of the constitution was interpreted by the courts. In particular, Guaneli predicted that the courts would interpret the amendment as an indication that the legisla-

ture wanted to abandon the current "reasonable basis" standard of constitutional scrutiny in favor of "some higher standard of scrutiny".[56] For this reason, Guaneli again urged the Committee to adopt the version of the amendment proposed in Joint Resolution No. 1.[57]

Instead of heeding Mr. Guaneli, immediately after he finished speaking, a member of the Finance Committee moved for passage of Joint Resolution No. 39 out of committee. In the ensuing vote, Joint Resolution No. 39 received a "do pass" recommendation by a 5–to–1 margin (with Senator Rieger dissenting).[58]

On March 2nd, at a meeting of the full Senate, Senator Donley introduced his promised letter of intent regarding Joint Resolution No. 39.[59] Section 2 of this letter of intent dealt with the level of judicial scrutiny that the legislature wanted the courts to employ when adjudicating constitutional challenges to firearms laws. It specified that the legislature intended for the courts to apply the "compelling state interest" test—in other words, strict scrutiny:

2. [The] Standard for Judicial Review under S[enate] J[oint] R[esolution] 39 is the "Legitimate and Compelling Governmental Interest" Test.

The legislature . . . notes the consistency in the language of the proposed amendment to art. I, sec. 19 and comparable language defining the right of privacy set out in art. I, sec. 22 of the state constitution and protecting personal privacy against government infringement. Because of the similarity of language between the two provisions, the legislature is of the view that the interpretation and standard of review adopted by the Alaska Supreme Court to circumscribe or abridge those rights under certain circumstances will

50. *Id.*

51. *Id.*

52. *Id.*

53. *Id.*

54. *Id.*

55. *Id.*

56. *Id.*

57. *Id.*

58. *Id.*

59. See 1994 Senate Journal 3034–35 (March 2nd).

also apply to the right defined by art. I, sec. 19. The legislature believes that the applicable test should be the "legitimate and compelling governmental interest" test in the form applicable to interpretation of the right to privacy, art. I, sec. 22 of the state constitution. The test was first identified in *Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1975 [1977]), and more fully articulated and explained in *Messerli v. State*, 626 P.2d 81, 86 (Alaska 1980). The test has worked well to protect the rights of Alaska's citizens in situations in which the asserted infringement involves a right that is not clearly defined by the courts as "fundamental." Therefore, the legislature is of the opinion that the standard of review contemplated by the amendment proposed to art. I, sec. 19 by SJR 39 be one that precludes abridgment or interference by governmental action unless the government meets its substantial burden of establishing that an abridgment or interference with the right may be justified only by a legitimate and compelling governmental interest.

The concluding section of this letter of intent, Section 3, then declared the legislature's belief that, even with this heightened level of scrutiny, the laws regulating the possession of firearms by convicted felons would still be constitutional. In other words, Section 3 was a proposed legislative "finding" that these laws were supported by a compelling state interest:

> 3. S[enate] J[oint] R[esolution] 39 Does Not Prevent the Legislature from Limiting Access and Possession of Arms by Convicted Felons and Those Convicted of Crimes of Violence.
>
> As in the majority of jurisdictions whose constitutions contain similar guarantees of an individual's right to keep and bear arms, the proposed amendment of art. I, sec. 19 does not preclude the appropriate exercise of the police power. The exercise of the police power must be in a manner that satisfies the requirements of the applicable test. To that end, the legislature

finds that there is both a legitimate and a compelling governmental interest in the enactment and enforcement of legislation prohibiting the possession of and access to firearms by those who, by their past conduct, have demonstrated an unfitness to be entrusted with their possession. Such legislation is both reasonably related to the protection of the general public from those who would use firearms to commit serious crimes and is sufficiently narrowly drawn to isolate those persons who, on the basis of their previous convictions for a serious offense, evidence a lack of fitness to be entrusted with these dangerous weapons for any reason. Specifically the legislature finds a legitimate and a compelling governmental interest in the enactment and enforcement of legislation limiting access and possession of arms by convicted felons and those convicted of crimes of violence.

Senator Donley's letter of intent was adopted by the full Senate on a vote of 16 to 3.[60] The Senate then passed Joint Resolution No. 39 by the same vote (16 to 3).[61]

*The history of the 1994 constitutional amendment in the Alaska House of Representatives*

Following the Senate's approval of Joint Resolution No. 39 and the accompanying letter of intent, Joint Resolution No. 39 was sent to the House.

Even with Senator Donley's letter of intent, the Department of Law and its allies continued to believe that the Senate's proposed constitutional amendment would, in fact, endanger many of Alaska's existing firearms laws, including the laws regulating the possession of firearms by non-violent felons. And in the House Judiciary Committee, these proponents of a more limited constitutional amendment initially won a victory with the support of the chair of the committee, Representative Brian Porter.

The House Judiciary Committee held hearings on Senate Joint Resolution No. 39 on

---

**60.** See 1994 Senate Journal for March 3rd; the final vote is at 3064.

**61.** *Id.* at 3065.

April 16 and 18, 1994.[62] In anticipation of these hearings, the Committee drafted a substitute bill to try to address the Department of Law's concerns about the breadth of the Senate version.

This substitute bill (which had already been circulated in draft form when the first committee hearing was held on April 16th [63]) retained the Senate's proposed amendment to Article I, Section 19, but added the word "unreasonably". In other words, the newly proposed sentence read: "The individual right to keep and bear arms shall not be *unreasonably* denied or infringed by the State or a political subdivision of the State." (Emphasis added) The Committee Substitute also added a second section to clarify that the proposed constitutional amendment was not intended to alter the standard of review that courts would employ when adjudicating constitutional challenges to firearms laws:

> * Section 2. Article XV, Constitution of the State of Alaska, is amended by adding a new section to read:
>
> Section 29. **Application of Amendment of Section 19 of Article I.** The 1994 amendment of Section 19 of Article I does not change the level of judicial scrutiny applicable to the review of laws relating to weapons.

On April 16th, Portia Babcock again appeared on behalf of Senator Leman to introduce Senate Joint Resolution No. 39 and speak in favor of it. Ms. Babcock acknowledged that the Department of Law was concerned "that passing this amendment will somehow abrogate laws that are currently on the books, or [laws] that may be [on the books] in the future." [64] However, Babcock told the House Judiciary Committee that Senator Leman, "[did] not believe that to be true".[65] According to Babcock, Senator Leman believed that the proposed constitutional

amendment "should change absolutely nothing", because Alaska's current firearms laws would be found to satisfy the "compelling government or state interest" test.[66]

Representative Gail Phillips asked Ms. Babcock to address the difference between Senate Joint Resolution No. 39 and the proposed substitute bill drafted by the House Judiciary Committee—in other words, the section of the Committee Substitute which proposed an amendment to Article XV to clarify that the courts should continue to employ the existing level of judicial scrutiny when adjudicating future constitutional challenges to firearms laws.[67]

Babcock told the Committee that Senator Leman was opposed to this change. According to Babcock, Senator Leman "[saw] a problem with setting a benchmark for courts to try and interpret [laws] in the future, because there is no [explicit] judicial level of scrutiny of weapons laws . . . right now." [68] Babcock warned that if the legislature passed the Committee Substitute and its proposed amendment to Article XV, the courts would not understand what the legislature was talking about, or what the legislature wanted, because there was no existing well-defined level of scrutiny for firearms laws.[69]

Babcock added that Senator Leman and other supporters of Joint Resolution No. 39 wanted to make sure that the legislature did not approve any language suggesting that firearms laws would pass constitutional muster as long as they were reasonable, or as long as they had "any positive justification".[70] According to Babcock, Senator Leman and the other supporters of Joint Resolution No. 39 had a very different intent: firearms laws would be unconstitutional unless they served

**62.** *See* Minutes of the House Judiciary Committee for April 16, 1994, Tape 94–60, Side A, beginning at 252, and for April 18, 1994, Tape 94–61, Side A, beginning at 850.

**63.** *See* Minutes of the House Judiciary Committee for April 16, 1994, Tape 94–60, Side A at 252.

**64.** *Id.* at 287.

**65.** *Id.*

**66.** *Id.*

**67.** *Id.* at 415, 435.

**68.** *Id.* at 440.

**69.** *Id.*

**70.** *Id.* at 508.

a "compelling governmental interest".[71]

After more discussion of this issue, Representative Porter offered a description of the three levels of judicial scrutiny commonly used by courts: "compelling interest" and "rational basis" on the two ends of the spectrum, and the "sliding scale" test as a middle level of scrutiny.[72] Representative Porter explained that the Committee Substitute was intended to "tell[ ] the [Alaska] supreme court: 'We like the fact that you are [using the sliding scale test], and we do not want to change that.' "[73] Porter added that, if the legislature adopted Joint Resolution No. 39 as proposed by the Senate, "this will tell the supreme court to use a higher standard of review than they are currently using."[74]

When the hearing was opened to public comment, all of the citizens who spoke—a total of twenty-five people—favored Senate Joint Resolution No. 39 over the proposed House Judiciary Committee Substitute.[75] Many of the speakers inveighed against any suggestion that firearms laws should be upheld if they were "reasonable".

These public comments lasted until late in the afternoon. Chairman Porter adjourned the House Judiciary Committee at 4:25 p.m.,[76] and the Committee resumed its consideration of this matter two days later, on April 18th.[77]

At the beginning of this second hearing, Representative Porter acknowledged that the testimony presented to the Committee had been overwhelmingly supportive of Joint Resolution No. 39 as proposed by the Senate, and had been overwhelmingly opposed to his Committee Substitute. Nevertheless, Representative Porter announced that he would personally sponsor the Committee Substitute in an effort to make sure that the courts

continued to use the existing standard of constitutional review—the "sliding scale" test—when adjudicating challenges to firearms laws.[78]

Representative Porter noted that the letter of intent that accompanied the Senate's proposal (*i.e.*, Joint Resolution No. 39) specified that the intended standard of review under the Senate's proposed amendment to Article I, Section 19 was the "compelling interest" test. In other words, according to Porter, if a law abridged the individual right to keep and bear arms, then "short of a compelling interest, that law will fall."[79] Porter believed that it was more appropriate to use the sliding scale test, under which a court "tries to balance the interest of the state against the interest of the individual and [then] make a rational decision [about the constitutionality of the law]."[80]

Representative Porter's comments on this subject drew immediate objection from another committee member, Representative Phillips, who indicated that neither she nor the people of Alaska would agree to a standard of constitutional scrutiny that would allow firearms laws to be upheld as long as they were "reasonable". For this reason, Representative Phillips announced that she would be voting against Porter's Committee Substitute.[81]

Representative Porter responded that he saw the problem arising from the other end of the spectrum. He pointed out that the language of the proposed amendment to Article I, Section 19 was worded as an absolute: the individual's right to keep and bear arms "shall not be denied". In addition, the Senate had expressly announced that one purpose of its proposal (Senate Joint Resolution No. 39) was to require the courts to use a

71. *Id.*

72. *Id.* at 710.

73. *Id.*

74. *Id.*

75. *Id.* at 777—end, and Tape 94–60, Side B at 000–692.

76. Tape 94–60, Side B at 692.

77. Minutes of the House Judiciary Committee for April 18, 1994, Tape 94–61, Side A, beginning at 850.

78. *Id.*

79. *Id.*, Tape 94–61, Side B at 000.

80. *Id.*

81. *Id.*

compelling state interest test when reviewing the constitutionality of firearms laws. Representative Porter feared that the seemingly absolute language of the proposed constitutional amendment, coupled with the requirement of a compelling state interest, would hamper or eliminate the government's ability to pass or enforce needed firearms laws. This, he said, was why he was offering the Committee Substitute.[82]

Representative Phillips responded that, based on her experience, people simply could not trust the courts to make reasonable rulings or to adopt reasonable interpretations of the law. She declared her belief that "it would [not] be good to give the courts any more flexibility, especially [concerning] something as precious as this [proposed] amendment".[83] For this reason, she continued to oppose the Committee Substitute and to support the Senate version.

When the final committee vote was taken, Representative Porter's views carried the day. His proposed Committee Substitute was adopted by the Judiciary Committee on a vote of 4 to 2.[84]

However, this victory for a more limited constitutional amendment was short-lived. When the two competing bills—Senate Joint Resolution No. 39 and the House Judiciary Committee's substitute—were presented to the House Finance Committee on April 30th, it was the Senate version that prevailed.[85]

Portia Babcock again presented, and spoke in favor of, the Senate version, while Representative Porter and Assistant Attorney General Dean Guaneli spoke in favor of the House Judiciary Committee's substitute bill.[86]

Representative Porter argued that the proposed constitutional amendment should be drafted so as to preserve firearms laws that did not *unreasonably* infringe on the right to keep and bear arms.[87] After Representative Porter finished, Representative Sean Parnell noted that the Senate version of the amendment "would change the level of judicial scrutiny [pertaining] to laws relating to weapons", and he encouraged discussion of this point.[88] In response, Mr. Guaneli agreed that the Senate's version of the amendment "would increase the level of scrutiny [that] the courts would apply to firearms laws." [89]

Representative Kay Brown then asked whether either version of the amendment would affect Alaska's laws regulating concealed weapons. In reply, Mr. Guaneli "mentioned a number of provisions in the concealed weapons [law] which could be struck down under a broad right to bear arms." [90]

This possibility did not deter the House Finance Committee from adopting the Senate version of the proposed constitutional amendment. After a little more discussion, the Committee voted in favor of the Senate version of the bill. (The vote was 6 to 2.) [91]

On May 2nd, the Senate version came up for its second reading on the House floor.[92] At that time, Representative Porter offered amendments to make the Senate version conform to the substitute version that his House Judiciary Committee had proposed (the version already rejected by the House Finance Committee).[93]

Specifically, Representative Porter proposed adding the word "unreasonably" to the new sentence in Article I, Section 19, so that it would read: "The individual right to keep

**82.** *Id.* at 129.

**83.** *Id.*

**84.** *Id.*

**85.** Minutes of the House Finance Committee for April 30, 1994, Tape HFC 94–149, Side 1, (000 to end), and Side 2 from 000 to 392.

**86.** *Id.*

**87.** *Id.*, Tape HFC 94–194, Side 1.

**88.** *Id.*

**89.** *Id.*

**90.** *Id.*

**91.** *Id.*

**92.** 1994 House Journal at 3936.

**93.** *Id.* at 3936–37.

and bear arms shall not be *unreasonably* denied or infringed by the State or a political subdivision of the State." [94]

In addition, Representative Porter proposed adding a new section to the bill, calling for an amendment to Article XV of the constitution to expressly declare that "[t]he 1994 amendment of Section 19 of Article I does not change the level of judicial scrutiny applicable to the review of laws relating to weapons".[95]

Representative Porter's amendments were voted down, 15 to 24.[96]

Following the defeat of Representative Porter's proposed amendments to Joint Resolution No. 39, Representative John Davies offered an amendment that would have added the following language to the end of the new sentence in Article I, Section 19: ", except that the exercise of this right may be regulated by law. [But no] law shall impose licenses, registration or special taxation on the ownership or possession of firearms." Representative Davies's amendment was voted down, 5 to 34.[97]

The House then scheduled the third reading of Senate Joint Resolution No. 39 for the following day (May 3rd).[98] At that third reading, the House passed Senate Joint Resolution No. 39 on a vote of 33 to 4.[99]

Following this vote, Representative Porter made one final attempt to narrow the effect of the proposed constitutional amendment. He asked the House to adopt the following letter of intent:

It is the intent of the legislature that the authority to review and pass laws on misuse of weapons is an important aspect of the legislature's responsibility to assure the health, safety and welfare of all Alaskans. It is the intent of the legislature that the individual right to bear arms set forth in S[enate] J[oint] R[esolution] 39 not

be an absolute right, and that it does not guarantee an individual the right to carry weapons at all times and under all circumstances, when the legislature has determined that such conduct is contrary to the public interest.[100]

The House refused to adopt this letter of intent. (The vote was 14 to 23.)[101] There was, however, a call for reconsideration of the House's underlying vote on the Senate Joint Resolution. That reconsideration took place the following day, May 4th. At that time, the House voted in favor of Senate Joint Resolution No. 39 by an even greater margin: 36 to 3.[102]

*The proposed constitutional amendment is submitted to the voters*

The constitutional amendment proposed in Senate Joint Resolution No. 39 was submitted to the voters of Alaska as Ballot Measure No. 1 in the 1994 general election. Both the supporters and the opponents of the proposed constitutional amendment submitted position statements for publication in the state election pamphlet.

The striking thing about the presentation of Ballot Measure No. 1 in the 1994 election pamphlet is that neither the statement in support of the measure nor the statement in opposition to the measure (nor even the position-neutral description of the measure written by the Legislative Affairs Agency) addressed the one undisputed effect that the proposed amendment would have on Alaska constitutional law: the institution of a new requirement that all firearms laws be narrowly tailored to a compelling state interest.

Rather than explaining that the proposed amendment was designed to require strict scrutiny of firearms laws—that is, to prohibit the legislature from enacting firearms laws unless those laws were founded on, and narrowly tailored to, a compelling state inter-

94. *Id.* at 3936.

95. *Id.* at 3937.

96. *Id.*

97. *Id.* at 3938.

98. *Id.* at 3940.

99. *Id.* at 3972.

100. *Id.* at 3973.

101. *Id.*

102. *Id.* at 3991.

est—the two position statements in the election pamphlet omitted any mention of this crucial point and jumped directly to predictions about the effect that this change in the constitution would have on Alaska's existing firearms laws.

The statement submitted in support of the proposed constitutional amendment declared that passage of the amendment would not undermine Alaska's existing firearms laws:

[A] YES [vote] on [this ballot measure] will not overturn or invalidate state laws restricting access [to] or possession of arms by convicted felons, mental incompetents, illegal aliens, those under the influence of drugs or alcohol, juveniles, or in school buildings. These laws are well-established and have been consistently upheld in Courts across the nation, even when considered under the toughest legal standard and under constitutional language more stringent than is proposed by [this ballot measure].

Alaska Division of Elections, 1994 Election Pamphlet, page B–20.

The statement in opposition to the proposed amendment took a different view. The opponents of the amendment predicted that the new constitutional provision would have serious and unintended effects on existing laws regulating the possession and use of firearms:

If this amendment should pass, be prepared for unannounced consequences. Passage of this amendment would undo laws [that are] currently in place. . . . Guns are [currently] not allowed on school grounds, . . . and felons cannot carry weapons. Our state's new concealed weapons law has many conditions limiting who can carry a concealed weapon. These laws which now protect us will be attacked in the courts if this amendment passes, and in all likelihood the laws will be thrown out.

Alaska Division of Elections, 1994 Election Pamphlet, page B–20.

The voters were also offered a neutral summary of the amendment, written by the Legislative Affairs Agency. This neutral summary also omitted any discussion or explanation of the legislature's intent to require strict scrutiny of firearms laws:

This state constitution [sic] protects the right of the people to keep and bear arms. It says that, a well-regulated militia being necessary to the state's security, the right of the people to keep and bear arms shall not be infringed.

This measure amends the state constitution by adding a specific reference to the individual right to keep and bear arms. The new language says that the individual right to keep and bear arms shall not be denied or infringed by the state or its political subdivisions.

The measure also changes the title for the section [i.e., the title of Article I, Section 19]. The new title would reflect the fact that the right covers both the keeping and the bearing of arms.

Alaska Division of Elections, 1994 Election Pamphlet, page B–20.

In sum, neither of the two position statements, nor the neutral summary written by the Legislative Affairs Agency, informed the voters of the constitutional *substance* of the amendment that was being put to a vote. None of these descriptions of the proposed amendment alerted voters to the fact that the amendment was intended to require strict scrutiny of all firearms laws. Instead, the voters were offered competing predictions of how the courts would *apply* the proposed amendment. In other words, the voters were offered competing predictions as to whether Alaska's various existing firearms laws would survive strict scrutiny analysis.

Moreover, the sanguine prediction offered by the supporters of the 1994 amendment appears to be no more than wishful or optimistic thinking.

As I have already noted, the statement in support of the amendment (quoted above) assured voters that the laws restricting the possession of firearms by felons or illegal aliens or mental incompetents "are well-established and have been consistently upheld in Courts across the nation, even when considered under the toughest legal standard".

But in truth, none of the types of firearms laws listed in the supporters' statement have

ever been upheld "under the toughest legal standard". That is, none of these laws have ever been upheld under a "strict scrutiny" or "compelling state interest" standard. This is because no other state in the country applies a "compelling state interest" or "strict scrutiny" level of constitutional review to firearms laws.

As the New Hampshire Supreme Court recently noted in *Bleiler v. Chief [of the] Dover Police Dept.*, 155 N.H. 693, 927 A.2d 1216 (2007):

> With respect to substantive due process challenges to gun control legislation, such as [the statutory requirement that citizens obtain a license to carry a loaded handgun], "[n]o state's judiciary applies a heightened level of scrutiny, much less strict scrutiny." [Adam] Winkler, *The Reasonable Right to Bear Arms*, 17 Stan[ford] L. & Pol[icy] Rev. 597, 600 (2006). "[S]tate courts universally reject strict scrutiny or any heightened level of review in favor of a standard that requires weapons laws to be only 'reasonable regulations' on the [right to bear arms]." *Id.* at 599; *see State v. Cole*, 264 Wis.2d 520, 665 N.W.2d 328, 336–37 (2003) (citing cases); *see also* [Jeffrey] Monks, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws*, 2001 Wis. L.Rev. 249, 259 ("When a court reviews a gun control statute, the test is almost always whether the gun restriction is a 'reasonable regulation' under the state's police power."). "Even courts that have found [the right to bear arms] to be fundamental have used a reasonableness standard." *Cole*, 665 N.W.2d at 337; *see also Robertson v. City and County of Denver*, 874 P.2d 325, 329–30 (Colo.1994) (citing cases).
>
> . . .
>
> [A]s numerous courts in other states have recognized with respect to their state constitutional right to bear arms, *see* [Winkler] at 602–03, the New Hampshire state constitutional right to bear arms "is not absolute and may be subject to restriction and regulation." *State v. Smith*, 132 N.H. 756, 758, 571 A.2d 279 (1990); *see*

> *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163, 172 (1993). "[S]ome regulation of firearms is necessary" because of the "obvious public dangers of guns." Winkler, *supra* at 600. Such regulation is a proper subject of the legislature's police power.

*Bleiler*, 927 A.2d at 1222–23.

One could argue, of course, that none but the most informed voters would have understood that the description of the law put forward by the amendment's supporters was false or, at best, misleading on this point. However, the voters were able to read the statement submitted by the opponents of the proposed constitutional amendment as well. And, as I explained earlier in this dissent, the opponents of the proposed amendment openly disagreed with the sanguine predictions of the amendment's supporters. The opponents predicted that if the amendment passed, there most likely would be several successful constitutional attacks on Alaska's firearms laws.

This debate in the 1994 election pamphlet between the supporters and opponents of the proposed amendment mirrored the debate that had occurred earlier in the legislature. During the legislative debates, the supporters of the proposed amendment to Article I, Section 19 declared that the amendment would not disturb Alaska's existing firearms laws, while the opponents of the amendment declared that this was not true—or, at least, that no one could guarantee this was true, given the heightened level of constitutional scrutiny that would apply to firearms laws if the amendment was enacted.

But unlike the legislative debate, the debate in the election pamphlet omitted all discussion of the substance of the proposed amendment. As I have explained, the substance of the amendment was the new requirement that all firearms laws be narrowly tailored to a compelling state interest. In the legislature, both the proponents and the opponents of the amendment understood this well—and their efforts (either to pass the amendment or defeat it) were premised on this understanding.

The 1994 election pamphlet offered the voters no information on this crucial issue. Instead, the voters merely received competing—and speculative—predictions about how the courts would apply the new amendment if it was adopted and Alaska's firearms laws were then challenged.

As we know, the proposed constitutional amendment was adopted by the voters in the November 1994 election.

### Why our analysis in Gibson is flawed

This Court held in *Gibson* that, even after the passage of the 1994 amendment to Article I, Section 19, the Alaska legislature retained the authority to enact reasonable firearms laws, and that the 1994 amendment was not intended to alter the constitutionality of Alaska's existing firearms laws.[103] This conclusion is flawed in several ways.

First, the 1994 amendment was unequivocally intended to require a "strict scrutiny"/"compelling state interest" test for firearms laws. Both the legislative supporters and the legislative opponents of the amendment agreed on this point. They likewise agreed that, if the amendment was enacted, the courts would no longer be able to use a "sliding scale" analysis when assessing the constitutionality of firearms laws, nor would courts be able to uphold those laws simply because they were "reasonable" exercises of the State's police power.

In *Gibson*, we applied a "sliding scale" analysis to the firearms law that was under attack: we upheld that law because it "[bore] a close and substantial relationship to the state's legitimate interest in protecting the health and safety of its citizens." *Id.* at 1302. This is the very type of legal analysis that the 1994 amendment was designed to forbid.

Second, contrary to what is stated in *Gibson*, the legislative history of the 1994 amendment does *not* demonstrate legislative agreement that the proposed constitutional amendment would leave Alaska's existing firearms laws intact.

The only point of legislative agreement was that the proposed constitutional amendment would alter Alaska constitutional law by requiring the courts to apply a "strict scrutiny" or "compelling state interest" test when adjudicating the constitutionality of firearms laws. The legislators greatly disagreed as to what this change in constitutional law would mean—*i.e.*, whether Alaska's existing firearms laws would survive this new, heightened level of scrutiny.

The supporters of Senate Joint Resolution No. 39 predicted that most, if not all, of Alaska's existing firearms laws would still be constitutional after passage of the proposed amendment. But even the supporters of Joint Resolution No. 39 did not offer a guarantee that all existing firearms statutes would be found constitutional under the new provision. As Portia Babcock candidly admitted to the Senate Finance Committee on February 15, 1994, she "[had] no idea how the [proposed] language would be interpreted" by the courts.[104] The opponents of Joint Resolution No. 39, for their part, predicted that many of Alaska's firearms laws would be endangered by the proposed amendment—and that some of these laws would ultimately be struck down.

Because the opponents of Senate Joint Resolution No. 39 thought that many of Alaska's firearms laws might not survive strict scrutiny analysis, they repeatedly offered revisions of the proposed constitutional amendment. Some of these proposed revisions would have expressly abandoned "strict scrutiny" and "compelling state interest" analysis, and would instead have allowed "reasonable" firearms regulation under the then-existing "sliding scale" level of judicial scrutiny. Other proposed revisions would have allowed strict scrutiny analysis of firearms laws, but would have expressly guaranteed the constitutionality of Alaska's existing firearms laws-a kind of "grandfather" clause.

But all of these efforts to revise Joint Resolution No. 39 were rejected by large margins. In other words, the legislature's goal was to require strict scrutiny of firearms

---

**103.** 930 P.2d at 1301–02.

**104.** Minutes of the Senate Finance Committee for February 15, 1994, Tape SFC–94, # 25, Side 1.

laws, even if this requirement potentially jeopardized the constitutionality of some of Alaska's existing firearms laws.

When both houses of the Alaska Legislature voted in favor of Senate Joint Resolution No. 39, these legislators were basically saying: (1) we want to amend the Alaska Constitution to require that firearms laws be narrowly tailored to a compelling state interest; (2) we believe that our existing firearms laws will survive this constitutional amendment; (3) but even if we are wrong, we believe that it is more important to enact a new, higher level of constitutional scrutiny—and we are willing to take the risk that some of our laws will not survive this change in constitutional law.

It is clear—both from the content of the committee debates, and the letter of intent drafted by Senator Donley—that the drafters and supporters of Senate Joint Resolution No. 39 voted for this measure, and rejected the competing measures, precisely because they did *not* want the legislature to be able to enact firearms laws that were merely "reasonable", or firearms laws that could be upheld under the "sliding scale" level of constitutional scrutiny. Rather, the drafters and supporters of Joint Resolution No. 39 explicitly and repeatedly declared that they wished to ensure that no firearms law would survive constitutional challenge unless the law was founded on a compelling state interest.

It is true that the backers of Senate Joint Resolution No. 39 often declared their belief that most, if not all, of Alaska's existing firearms laws would survive the newly mandated, heightened level of judicial scrutiny. But this was simply their prediction. Moreover, the backers of Joint Resolution No. 39 repeatedly demonstrated that they did not wish to be constitutionally bound to this prediction. Whenever this issue came to a vote—that is, whenever the opponents of Joint Resolution No. 39 offered amendments or counter-proposals that would have explicitly guaranteed the continued constitutional vitality of Alaska's existing firearms laws— the backers of Joint Resolution No. 39 rejected these efforts.

It is also true, as I have explained, that the concluding section of the legislature's letter of intent contained a legislative "finding" that the laws regulating the possession of firearms by convicted felons were supported by a compelling state interest, and thus these laws should survive the heightened level of scrutiny mandated by the new constitutional amendment. But this type of "finding" is not binding on the courts.

Legislators can not render a law constitutional simply by declaring that they find the law to be constitutional, or by declaring that they find the law to be supported by a compelling state interest. It is up to the courts to decide whether a state interest is sufficiently "compelling", and whether a challenged statute is sufficiently narrowly tailored to that interest.

With particular respect to the "felon-in-possession" statute at issue in this case, even though the legislators who voted for the 1994 constitutional amendment may have *believed* that Alaska's felon-in-possession laws were narrowly tailored to a compelling state interest, they had no power to bind the courts of Alaska to accept their view of the matter—no more than if these legislators had enacted a statute prohibiting certain types of speech and had then declared, in a letter of intent or otherwise, that they believed the new restriction on speech was narrowly tailored to a compelling state interest.

For these reasons, I conclude that the *Gibson* decision contains a flawed and mistaken analysis of the legislative intent behind the 1994 constitutional amendment.

Our decision in *Gibson* is also based on a simplistic and legally mistaken view of the statements in the 1994 election pamphlet.

When a constitutional amendment (or any other ballot measure) is submitted to the voters of Alaska, the supporters and opponents of the measure are given the opportunity to submit statements (*i.e.*, explanations of why they support or oppose the measure) for inclusion in the statewide election pamphlet. In *Gibson*, we relied on the election pamphlet statement submitted by the supporters of the 1994 amendment as our basis for interpreting the amendment to allow the

legislature to engage in "reasonable" regulation of firearms. In essence, our conclusion was based on the following flawed reasoning:

(1) the statement in support of the 1994 amendment assured voters that passage of the amendment would not affect the constitutionality of Alaska's existing firearms laws or the legislature's ability to enact other similar laws; therefore

(2) the people who voted in favor of the 1994 amendment must have believed that passage of the amendment would not affect the constitutionality of Alaska's existing firearms laws, and that the legislature could continue to enact reasonable regulations restricting the possession and use of firearms; and therefore

(3) the courts of Alaska should interpret the 1994 amendment in a manner that does not affect the constitutionality of Alaska's existing firearms laws, and that does not bar the legislature from enacting future reasonable regulations concerning the possession or use of firearms.

The first mistake in this reasoning is one of fact: it was a mistake to assume that all of the people who voted in favor of the 1994 amendment did so because they believed that enactment of the amendment would have no effect on Alaska's existing firearms laws. Based on the public comments that the legislature received regarding the 1994 amendment (as recorded in the minutes of the legislative hearings on the proposed amendment), it is likely that many Alaskans voted for the 1994 amendment precisely because they hoped that this amendment *would* jeopardize the constitutionality of Alaska's existing firearms laws.

As I explained earlier, the comments offered by Alaska citizens at the various legislative hearings on the proposed amendment revealed that many of these citizens held a strong belief that the state government had already exceeded the permissible boundaries of firearms regulation. For example, when the Senate State Affairs Committee held its hearing on Senate Joint Resolution No. 39, one witness asserted that, because "the federal government is doing everything it can to take away our freedom, our rights, and our guns", it was "important that the State of Alaska stand up and commit itself".[105] Another witness declared that, in his view, it is never proper for the government to enact restrictions on firearms, even when a valid public safety concern exists. This witness declared that he "interprets the Constitution literally, and [he] believes it is unconstitutional to restrict firearms in any manner." [106]

Later, when the House Judiciary Committee held its hearings, and Representative Porter presented his substitute measure that would have guaranteed that firearms laws would be constitutional so long as they were "reasonable" (instead of having to be narrowly tailored to a "compelling state interest"), every citizen who spoke during the public comment period—twenty-five in all—declared that they supported the original Senate version over Representative Porter's proposed substitute. Many of these speakers took particular exception to the suggestion that firearms laws should be upheld as long as they were "reasonable".

The public sentiment expressed in 1994 does not reflect a brief or transient Alaskan opposition to gun laws. Rather, opposition to firearms regulation remains a fixture of the political scene in Alaska. While I was working on this dissent, an article appeared in the Anchorage Daily News entitled "Legislator wants Alaskans Able to Build, Keep Restricted Firearms".[107]

This Associated Press article described the remarks delivered by Representative Mike Kelly to 400 members of the "Second Amendment Task Force"—a "gun rights group that has urged gun owners to openly display their weapons". Representative Kelly announced that he was "drafting a bill that would allow firearms restricted under federal law to be built and used in Alaska." The

---

105. Minutes of the Senate State Affairs Committee for January 21, 1994, Tape 94–2, Side B at 103.

106. *Id.*, Tape 94–3, Side A at 164.

107. See the Anchorage Daily News print edition for March 9, 2009, page A–9. This article was first published online on March 8th. The online version is available at www.adn.com/news/alaska/story/715801.html.

plan is to circumvent federal restrictions on these weapons (restrictions enacted under the authority of the interstate commerce clause of the federal constitution) by specifying that the weapons must be "built and kept entirely in [this] state".

In this same speech, Representative Kelly declared that "he resents infringements on gun rights, such as having to go through a metal detector at a courthouse."

While this dissent was being finalized, a follow-up article appeared. This article reported that Representative Kelly had secured 10 co-sponsors for his measure and that, on April 16, 2009, the measure was approved by the Alaska House of Representatives on a 32–7 vote.[108]

We must take account of this widespread opposition to firearms laws when we attempt to ascertain the motives of the voters who approved the 1994 amendment to Article I, Section 19 of our state constitution.

Undoubtedly, the opponents of the 1994 amendment were trying to dissuade citizens from voting for the amendment when, in their election pamphlet statement, they warned that people should "be prepared for unannounced consequences", and that "laws which now protect us will be attacked in the courts if this amendment passes, and in all likelihood the laws will be thrown out". But in fact, for many Alaskans, these predictions of successful attacks on existing firearms laws would be an inducement to vote *for* the constitutional amendment. In other words, it is fair to assume that many of the people who voted for the proposed amendment hoped to achieve the very results described in the statement in opposition.

It was therefore a mistake for us to assume in *Gibson* that all of the people who

voted in favor of the 1994 amendment voted that way because they believed that the amendment would have no effect on Alaska's existing firearms laws. To the contrary: it is likely that many Alaskans voted for the 1994 amendment precisely because they believed, or at least hoped, that this amendment *would* jeopardize the constitutionality of Alaska's existing firearms laws.

The second mistake in *Gibson's* reasoning is one of law.

It is true, as this Court noted in *Gibson*, that the election pamphlet statement in support of the 1994 constitutional amendment assured voters that the proposed amendment would not affect the constitutionality of Alaska's primary firearms regulations (like the felon-in-possession statute at issue in this case). In their position statement, the supporters of the 1994 amendment declared that such laws had been adjudged constitutional even under "the toughest legal standard" of constitutional scrutiny. *Gibson*, 930 P.2d at 1302.

As I have already explained, this latter assertion—that firearms laws like Alaska's had already survived strict scrutiny or "compelling state interest" analysis in other states—was (and remains) false. No other state employs this constitutional test for firearms laws.

Moreover, nothing in the 1994 election pamphlet contradicts (or even mentions) the core premise of the proposed constitutional amendment—the legislature's intention that firearms laws in Alaska would be subject to a "strict scrutiny" or "compelling state interest" test. Even if we assume that the voters who ratified the 1994 amendment believed, or hoped, that this change in constitutional law would not undermine the constitutionality of

---

**108.** This Associated Press article appeared in two different forms in the Anchorage Daily News. In the print edition of the paper, the article appeared on April 17, 2009 (page A–4) and was entitled "House OKs exemption for Alaska-made guns". In the online edition of the paper, the article was published on the evening of April 16, 2009 and was entitled "Bill 'exempts' Alaska from gun regulation". The online version of the article is available at www.adn.com/news/alaska/story/762363.html.

The two versions of the article contain substantially different texts. According to the online article (which contains the fuller description), Representative Kelly's bill purports to exempt all guns and ammunition manufactured and kept within Alaska from federal firearms regulation. Representative Kelly is reported to have stated that the bill was intended to allow Alaskans to "reclaim rights guaranteed by the Second Amendment", and that Alaska will now "handle the regulation of [these weapons and ammunition]".

Alaska's existing firearms laws, it would still be the duty of this Court to interpret the 1994 amendment as its drafters intended.

Under Alaska law, the legislature proposes constitutional amendments, and the voters then decide whether to approve or reject these proposed amendments. The legislative history of the 1994 amendment clearly shows that the intent of the amendment was to alter Alaska constitutional law by requiring that all firearms laws be narrowly tailored to a compelling state interest. The people who drafted the position statements for the 1994 election pamphlet had no authority to change the meaning of the amendment.

Regardless of how the election pamphlet position statements were worded, the intent and effect of the proposed constitutional amendment remained the same. That is, the 1994 amendment continued to embody the change in constitutional law—the new requirement of strict scrutiny of firearms laws—that the legislature intended when the legislature approved the amendment and submitted it to the voters.

Even if we were to assume that all of the people who voted for the amendment believed that Alaska's existing firearms laws would survive this change in the level of constitutional scrutiny, the voters' prediction concerning the outcome of future constitutional challenges to firearms laws—the prediction that these laws would survive strict scrutiny review—is entitled to no greater deference than the same prediction made by the amendment's supporters in the legislature. The courts are not bound by either legislators' or voters' predictions of how an amended constitutional provision will be interpreted and applied—unless that "prediction" is actually codified in the amendment itself.

An analogous situation recently arose in an Anchorage municipal election. In the April 2009 municipal election, Anchorage voters were asked to decide whether to change the formula that is used to compute the municipal tax cap. Proponents of the new formula predicted that it would result in lower property taxes, while opponents of the new formula predicted that taxes would actually go up if the formula was changed in the manner proposed. The voters approved the change.

It is too early to tell which side made the more accurate prediction. But assuming (for purposes of argument) that the opponents of the change were correct, and that the new formula will in fact produce higher taxes, it would be completely improper for a court to alter the newly enacted formula—*i.e.,* change the formula to ensure that it produced lower taxes—on the theory that the law must be interpreted in a manner that satisfies the predictions of the people who voted for it.

But that is exactly what this Court did in *Gibson.* Because the election pamphlet statement in support of the 1994 amendment *predicted* that Alaska's firearms laws would survive the proposed change in the constitution, and because a majority of Alaskans then voted in favor of the amendment, this Court concluded that the amendment embodied a guarantee that all of Alaska's then-existing firearms laws would remain constitutional after its passage.

As I have explained, this is completely at odds with the legislative history of the 1994 amendment. During the legislature's consideration of the proposed constitutional amendment, both houses explicitly and repeatedly rejected language that would have guaranteed the constitutionality of Alaska's existing firearms laws.

In other words, before the legislature approved the proposed amendment and presented it to the voters, the legislature made sure that the amendment did *not* contain a provision guaranteeing the constitutionality of Alaska's existing firearms laws. It was error for this Court to interpret the amendment to include this guarantee, based on the content of the 1994 election pamphlet statement in support of the amendment.

In *Gibson,* this Court cited the Maine Supreme Court's decision in *State v. Brown,* 571 A.2d 816 (Me.1990), as providing support for our action. But the *Brown* decision does not support what we did in *Gibson.*

In *Brown,* the Maine Supreme Court relied on a statement in the state election pamphlet to ascertain the intent of the voters who enacted a "right to bear arms" amend-

ment to that state's constitution. But as the *Brown* decision explains, the statement in question was an objective evaluation of the proposed amendment prepared by the Attorney General of Maine.

(The law of Maine requires the attorney general to prepare and disseminate a nonpartisan analysis of every proposed constitutional amendment—"a brief explanatory statement which shall fairly describe the intent and content of each constitutional resolution ... presented to the people". *Brown*, 571 A.2d at 817.)

In this official analysis of the proposed amendment, the Maine Attorney General wrote that, even after enactment of the proposed amendment, the personal right to keep and bear arms "would [still] be subject to reasonable limitation by legislation". *Id.* at 818. The Maine Supreme Court declared that the voters would be presumed to have understood and accepted the attorney general's construction of the proposed amendment "[i]n the absence of a challenge to the Attorney General's official explanation of the amendment". *Id.*

In other words, the Maine Supreme Court was dealing with an uncontested and ostensibly objective evaluation of the proposed amendment, offered by the Maine attorney general pursuant to his statutory duty to describe proposed constitutional amendments to the voters. No one suggested that the attorney general's description was one-sided or misleading, or that it departed from the intention of the amendment's drafters.

The 1994 Alaska election pamphlet did, in fact, contain an objective, non-partisan summary of the legislature's proposed amendment to Article I, Section 19. This neutral summary was prepared by the Legislative Affairs Agency. But as I explained earlier in this dissent, this summary of the proposed amendment was completely silent on the most important aspect of the amendment: the summary failed to mention the fact that the primary goal of the amendment was to require that all firearms laws meet a strict scrutiny/compelling state interest test. Moreover, the Legislative Affairs Agency's summary made no prediction about the fate

of Alaska's existing firearms laws if the amendment was approved.

In other words, unlike the voters in Maine, the voters of Alaska had no objective reference point for evaluating the actual legal substance of the proposed constitutional amendment—its new restriction on the authority of the legislature to enact firearms laws. Indeed, the voters of Alaska received essentially *no information* on this crucial issue. Instead, the voters merely received competing predictions, from two partisan groups, as to how Alaska's existing firearms laws would fare if the constitution was amended as proposed.

The Alaska Legislature repeatedly and forcefully expressed its desire to require strict scrutiny of firearms laws, and the legislature repeatedly rejected attempts to include a guarantee for Alaska's existing firearms laws. In *Gibson*, this Court disregarded the legislature's intentions and instead interpreted the 1994 amendment in accordance with one of the partisan descriptions in the election pamphlet. This was legal error.

### Conclusion

For the reasons explained here, I conclude that *Gibson* was wrongly decided. *Gibson* was badly researched, and its reasoning is flawed.

I take no pride in saying this, for I was one of the judges who joined the Court's decision in *Gibson*. But I now perceive that the conclusion we reached in *Gibson* is wrong.

The 1994 amendment to Article I, Section 19 was *not* intended to preserve Alaska's existing firearms laws. In fact, the legislature repeatedly rejected language that would have expressly guaranteed the constitutionality of Alaska's existing firearms laws.

More importantly, the 1994 amendment was *not* intended to allow the legislature to enact firearms laws that were merely "reasonable" exercises of the State's police power. The legislature repeatedly declared that its goal was to amend our state constitution to require strict scrutiny of firearms laws. In other words, it would no longer be suffi-

cient for firearms laws to be "reasonable", or for firearms laws to satisfy the "sliding scale" standard of judicial review that had been used in the past. Instead, firearms laws would have to be narrowly tailored to a compelling state interest.

In *Gibson*, we failed to apply this heightened level of scrutiny when we assessed the constitutionality of the challenged firearms law. Instead, we applied a "sliding scale" test: we upheld the challenged law because it bore a "close and substantial relationship" to a government interest. *Gibson*, 930 P.2d at 1302. This was error.

In the present case, my colleagues again employ the "close and substantial relationship" test to uphold another firearms law—this time, the felon-in-possession statute. This, too, is error.

This Court's majority opinion relies on the fact that "other states have consistently rejected similar constitutional challenges" to felon-in-possession statutes. This may be true, but it has little relevance—because, as I explained above, no other state employs a "strict scrutiny" or "compelling state interest" test when adjudicating the constitutionality of firearms laws. Every other state has interpreted its constitution to allow "reasonable" regulation of firearms—a position that our legislature firmly rejected when it drafted the 1994 amendment to Article I, Section 19.

Concededly, *Gibson* is currently the binding precedent on the meaning of Article I, Section 19. Therefore, when I argue that *Gibson* was wrongly decided and should be reversed, I must demonstrate both (1) that the interpretation of Article I, Section 19 announced in *Gibson* was originally erroneous, and (2) that "more good than harm would result from a departure from precedent". *State v. Dunlop*, 721 P.2d 604, 610 (Alaska 1986) (quoting *State v. Souter*, 606 P.2d 399, 400 (Alaska 1980)).

I trust that I have adequately explained why I conclude that *Gibson's* analysis of Article I, Section 19 is—and was from the beginning—erroneous. The remaining question is

whether the act of overruling *Gibson* would accomplish more good than harm.

It is important to emphasize that, when a court must decide whether to correct an earlier mistaken interpretation of a constitutional provision, the "more good than harm" test does *not* allow the court to substitute its own value judgements, or its own views of the public good, for the judgements and views of the provision's framers. Rather, the court's duty is to implement the intent of the framers.[109]

Of course, an appellate court need not defer to the legislature's (or the voters') views concerning the ultimate legal consequences of a particular constitutional provision. And when the meaning or intent of a constitutional provision remains unclear or ambiguous even after a thorough examination of the legislative record, a court may properly employ "precedent, reason, and policy" to resolve the matter.

But when a court is called upon to decide the meaning of a provision of our state constitution (either an original provision or a later amendment), it is the court's duty to interpret that provision as the framers of the provision intended—regardless of the judges' personal views concerning the wisdom of the policy choice embodied in the constitutional provision.

In other words, when this Court assesses whether "more good than harm would result" if we corrected the mistaken interpretation of the 1994 amendment that we adopted in *Gibson*, it is irrelevant whether we judges, individually or as a group, believe that the public good would be advanced if the Alaska Constitution allowed the legislature to enact all reasonable firearms laws. Rather, we must ask whether it would be better or worse, in terms of the rule of law and the proper functioning of our system of constitutional government, if we now interpreted Article I, Section 19 as the authors of the 1994 amendment intended—*i.e.*, interpreted it to require strict scrutiny of firearms laws.

In the absence of some good reason to think that the intended purpose of Article I, Section 19 conflicts with another constitution-

---

**109.** *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710   (Alaska 1992).

ally protected right or another constitutionally granted authority, the answer to the question posed in the preceding paragraph is obvious: it is better to interpret and apply the constitutional provision as it was intended by its drafters.

Accordingly, I conclude that this Court should—indeed, must—overrule *Gibson* and hold that Article I, Section 19 of the Alaska Constitution requires us to apply a "strict scrutiny" or "compelling state interest" test when we assess the constitutionality of statutes regulating the possession or use of firearms.

We should then give the parties the opportunity to re-brief the issue raised in this case—*i.e.*, the constitutionality of the statute that prohibits even non-dangerous felons from possessing a concealable firearm—under this heightened level of constitutional scrutiny.